478 F.2d 1404
 83 L.R.R.M. (BNA) 2447, 71 Lab.Cas. P 13,764
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
* National Labor Relations Board, Petitioner
v.
Unelko Corporation, Respondent.
 No. 72-1239.
 United States Court of Appeals, Seventh Circuit.
 May 2, 1973.
 
 Before SWYGERT, Chief Judge, STEVENS and SPRECHER, Circuit Judges.
 
 Order
 
 1
 The question is whether Respondent effectively withdrew from multi-employer labor negotiations before it became bound to accept the terms of the agreement negotiated by the employers' representative.
 
 
 2
 The Board found that Respondent had not withdrawn before negotiations for a new contract commenced on March 2, 1971, and that no exceptional circumstance justified a later withdrawal. Although we do not accept the premise that no withdrawal was permissible after March 2, 1971, we are persuaded that Respondent's communications with the Union prior to April 16, 1971, were sufficiently ambiguous to justify the Board's conclusion that it was then too late to withdraw. We therefore enforce the Board's order requiring Respondent to abide by the terms of the agreement which became effective on May 1, 1971.
 
 
 3
 Respondent is one of about 65 members of the Waste Trade Industry of Chicago. Since 1959 that Association has negotiated five three-year collective bargaining agreements on behalf of its members with the Waste Materials Handlers Unions.[1] During each of the first four negotiations, Howard Ohlhausen, president of Respondent company, was a member of the Association's negotiating committee; he was not a member of the committee during the 1971 negotiations.
 
 
 4
 The 1968 agreement contained the following provisions:
 
 
 5
 "ARTICLE XXVII--AUTHORITY WITHDRAWAL OF EMPLOYERS
 
 
 6
 "The Association represents that it is legally authorized to enter into this Agreement for and on behalf of the Employers listed in Exhibit I attached hereto. It is agreed that although the Employers shall execute this Agreement individually, the said Employers shall be bound by this Agreement immediately upon its execution by the Association and the Union, and the failure of any Employer to individually execute this Agreement shall not have any legal effect.
 
 
 7
 "In the event any Employer shall cease to be a member of the Association during the term of this Agreement, such Employer shall still be bound by this Agreement for the term hereof."
 
 
 8
 The 1968 agreement set the wage rates for nine different categories of employees, including "Rag Sorters and Trimmers." A supplemental agreement between the Union and four members of the Association provided that their Rag Sorters and Trimmers would be paid 10 cents an hour less than the contract rate; the contract which Respondent signed contained no reference to the supplemental agreement.
 
 
 9
 The justification for the wage differential rested on the fact that the four favored companies were engaged exclusively in the wiper rag industry and could not otherwise survive competition from nonmember companies in the South. Although Respondent was not engaged exclusively in the wiping rag industry, in 1968 it employed 17 Rag Sorters and Trimmers and was a substantial competitor of the four favored concerns. After the differential went into effect, Respondent lost a significant volume of business to its four favored competitors. In 1971, Respondent employed only two Rag Sorters and Trimmers.
 
 
 10
 Exactly when Howard Ohlhausen learned of the existence of the supplemental agreement favoring Respondent's competitors is not entirely clear. He had been present at the negotiating session on May 7, 1968, when the Union was requested to give special consideration to the members engaged exclusively in the wiping rag business, and the minutes of that meeting state that the terms of the supplemental agreement were agreed upon at that time. Ohlhausen, however, testified that he did not know that the agreement had been made. It was not until late February or early March of 1971 that he "knew specifically which firms, which four firms, were paying a certain amount less." A. 107-108.
 
 
 11
 Almost a year earlier, in April of 1970, Respondent had sent a letter of resignation to the Association. Under the Association's by-laws a member could resign only during the 30-day period preceding the expiration of the Union contract; for that reason, Respondent's attempted resignation was ineffective.
 
 
 12
 The Union learned of Respondent's attempt to resign, and therefore was aware of the possibility that Respondent might not participate in the multi-employer bargaining in 1971. However, Respondent did not communicate directly with the Union on this subject in 1970.
 
 
 13
 It is clear, of course, that even though Respondent had not effectively resigned from the Association, it could have advised the Union that in the future it would negotiate its own labor contracts. And, conversely, even if the resignation had been effective, it would have been possible for Respondent again to participate in the same multi-employer bargaining as in the past. In short, even though as a practical matter the Association membership probably would be co-extensive with the bargaining unit, that consequence was by no means necessary. Thus, the fact that Respondent attempted to resign from the Association in April of 1970, and the further fact that the Union was aware of the attempt, did not require the Board to conclude that Respondent had then withdrawn from the bargaining unit.
 
 
 14
 In January of 1971, during the course of a meeting with Union representatives at Respondent's plant, reference was made to Respondent's earlier attempt to resign from the Association. Ohlhausen testified that he then discussed his desire to make a separate agreement with the Union.[2] Thereafter, on January 25, 1971, the Union sent Respondent a formal notice of its desire to amend the contract which would expire on April 30, 1971, stating: "You will be furnished a copy of suggested amendments in a few days." A. 64. However, the Union did not forward its proposals to Respondent in the ensuing few days, nor did it engage in any separate negotiations with Respondent.
 
 
 15
 On March 2, 1971, negotiations between the Union and the Association commenced. There is no evidence that Respondent received any notice or was made aware of the fact that the first meeting would be held on that date. On March 12, the Association sent Respondent a letter reminding it that if it still wished to resign it should do so between March 31 and April 30. A. 7, 70.
 
 
 16
 On March 23, 1971, two Union officers met with Ohlhausen (Respondent's president) and his brother on another subject. At that meeting the Union representative told Ohlhausen "that we already agreed--already had agreed upon a contract." A. 91. Although his meaning is not entirely clear, he was apparently referring to the "agreement" by members of the Union on the content of their proposals, since the basic agreement between the Union and the Association was not reached until March 29, 1971. In any event, when Ohlhausen stated that he had not seen the proposals, one of the Union officers went out to his car and obtained a copy for him. Thereafter, on that day and again three days later in a telephone conversation, the Union asked Ohlhausen if Respondent was resigning from the Association. Ohlhausen's response was that he had not yet decided and could wait until April 30 to make up his mind. He took no definite unequivocal action prior to April 13, 1971, the day on which the Association members met to ratify the new contract.
 
 
 17
 During this period Respondent was, of course, aware of the wage differential which favored the four firms engaged exclusively in the wiping rag business, and it is reasonable to infer that Respondent also realized that the new contract would maintain--and, indeed, in its third year, increase--that differential. Since the Association's position on the negotiations involved a significant conflict of interest within its membership, we think it is clear that Respondent had a right to withdraw from the negotiations after they had commenced on March 2. However, we think it is likewise clear that in order to make its contemplated withdrawal effective, Respondent had an obligation to act promptly and decisively after it became aware of the posture of the negotiations in late March. Even if it had advised the Union that its continued participation in the multi-employer group was contingent on the elimination of the wage differential, we would have a different case. The record indicates, however, that Respondent merely stated that it had not decided whether or not to withdraw and would not do so until April 30. On this record the Board's conclusion that Respondent had not met its burden of proving an effective withdrawal prior to April 13 was certainly justified.
 
 
 18
 Respondent attended the Association meeting on April 13. At that meeting Ohlhausen urged the membership to reject the contract unless the Union agreed to eliminate the wage differential. The membership authorized their negotiator to seek that change, but also authorized him to execute the agreement as submitted if the Union would not accept any changes. Apparently no serious negotiation followed, and the agreement was accepted.
 
 
 19
 On April 16, 1971, Respondent resigned from the Association and so advised the Union. Thereafter it sought to negotiate separately, but the Union took the position that Respondent was already bound by the Association agreement.
 
 
 20
 As already indicated, we think the Board correctly concluded that Respondent had not withdrawn from the bargaining group before negotiations commenced on March 2, 1971. Respondent argues that a later withdrawal was justified by the unusual circumstances disclosed by this record--the anti-competitive wage differential, the Association's unusual by-law restriction on resignation, and the conflict of interest within the Association. No doubt Respondent could have withdrawn even after the negotiations started on March 2, but we agree with the Board that it could not postpone unequivocal action until after the Association membership had voted to accept the new contract. We are satisfied that the record supports the following conclusion stated by the Trial Examiner:
 
 
 21
 "Based on Ohlhausen's undenied indecision regarding Respondent's intentions to remain in the Association and/or accept the Association contract, his evasiveness as to what transpired during the negotiations for the 1968-71 contract regarding the lower wage scale discussed at that time, and his failure to announce his withdrawal from the Association at the general membership meeting of the Association on April 13 when the members voted to accept the renewal contract over his opposition, I credit Currie's testimony that he never agreed to negotiate separately with Respondent or fixed a date to do so. I, therefore, conclude that the Union neither waived the untimeliness of Respondent's notice to withdraw from the multi-employer bargaining unit nor consented to bargain separately with Respondent. Apparently, Respondent was agreeable to having the Association bargain on its behalf as long as it appeared possible for it to obtain advantageous terms. It procrastinated in announcing its refusal to accept the new contract until the terms were finally agreed on and did not include the changes it sought.
 
 
 22
 * * *
 
 
 23
 * * *
 
 
 24
 "Respondent simply postponed committing itself until it ascertained that the agreement reached was not to its liking, and then decided to seek negotiations for a more advantageous contract." A. 11-12, 12-13.
 
 
 25
 We have carefully considered each of Respondent's arguments, but we have concluded that the Board's order should be
 
 
 26
 Enforced.
 
 
 
 *
 13-CA-10573; 195 NLRB No. 34
 
 
 [1]
 Local 20467, United Transport Service Employees, AFL-CIO
 
 
 [2]
 See A. 76-78